1

2

3

4

5                          UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
6                                   AT SEATTLE

7    JOSEPH and ADAM SMITH,

8                          Plaintiffs,              CASE NO. C21-5380-BHS-SKV

9          v.                                       ORDER RE: RMI MOTION TO
                                                    EXCLUDE OR LIMIT EXPERT
10   RESULT MATRIX, INC., et al.,                   TESTIMONY AND REPORT

11                         Defendant/Cross
                           Claimant,
12         v.

13   DALE PEROZZO,

14                         Cross Defendant.

15

16                                   INTRODUCTION

17         Plaintiffs Joseph and Adam Smith bring claims against Defendant Result Matrix, Inc.

18   (RMI) under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq*. Dkt. 1. Now

19   pending before the Court is RMI's Motion to Exclude, or Limit, Proffered Testimony and Report

20   of Evan D. Hendricks. Dkt. 35. Plaintiffs oppose RMI's motion. Dkt. 40.[1] The Court, having

21   _____

22         [1] Plaintiffs also filed a surreply, asking the Court to strike certain false and impertinent statements
     in RMI's reply brief. Dkt. 46. Plaintiffs identify as false RMI's statement that, in listing cases in which
     Hendricks testified, "the most recent case [Plaintiffs cite] was filed in 2012, a full decade ago." Dkt. 42 at
23   4:17-19. Because Plaintiffs demonstrate the inaccuracy of this statement, *see* Dkt. 46 at 2 & Dkt. 40 at 6-
     7 (citing, *inter alia*, *Sponer v. Equifax Info. Servs., LLC*, No. C17-2035 (D. Or. Aug. 8, 2019) (Dkt. 123 at
24   3 & Dkt. 152 at 118-66)), this request to strike is GRANTED. However, the other requests are DENIED.

1  considered the briefing filed in support and in opposition to the motion, along with the remainder

2  of the record, herein finds and concludes as follows.

3  BACKGROUND

4      This matter involves RMI's issuance of "mixed file" consumer reports in relation to

5  Plaintiffs, meaning reports containing information belonging to individuals other than Plaintiffs.

6  *See* Dkt. 1.[2]  In this instance, the other individuals included in the reports had criminal histories

7  as sex offenders.  *Id.*  Plaintiffs allege RMI violated the FCRA through the publication of

8  incorrect information, leading to, among other things, the rejection of their application to rent

9  property.  Plaintiffs also allege RMI violated the FCRA in failing to disclose all of the

10  information in their credit files at the time of their request for the same.  In support of these

11  claims, Plaintiffs seek to present an expert witness report and testimony from Evan D.

12  Hendricks.  *See* Dkt. 35-1.  RMI, in the motion currently before the Court, seeks to exclude or

13  limit the proffered expert evidence.

14  DISCUSSION

15      Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under that

16  rule, expert testimony is admissible if "the expert's scientific, technical, or other specialized

17  knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

18  Fed. R. Evid. 702(a).  An expert's opinion testimony must be helpful to the trier of fact, based on

19

20  The Court does not find RMI's reference to cases in which Hendricks was excluded from testifying to be impertinent.  *See infra* n.4.  Nor did RMI inaccurately depict Plaintiffs' responsive brief as untimely.

21  Pursuant to Local Civil Rule (LCR) 7(d)(3), Plaintiffs should have filed their opposition to RMI's nondispositive motion no later than the Monday prior to the noting date.  *Johnson v. Allstate Fire & Cas.*

22  *Ins. Co.*, No. C11-1541-MJP, 2012 WL 13028542, at *1 (W.D. Wash. June 28, 2012).  *Cf.* LCR 7(d)(2) (filing deadlines applicable to motions for relief from a deadline and for protective orders).  The Court nonetheless considers Plaintiffs' brief, while advising that any future untimely filings may be stricken.

23      [2] RMI issued the consumer reports through its subsidiary Straight Arrow Screening.  *See* Dkt. 1,

24  ¶¶ 2.6, 4.14 and Dkt. 35-2, ¶7.  Unless otherwise necessary, the Court herein refers only to RMI.

ORDER RE: RMI MOTION TO EXCLUDE OR
LIMIT EXPERT TESTIMONY AND REPORT - 2

1    sufficient facts or data, based on reliable principles and methods, and result from a reliable

2    application of the principles and methods to the facts of the case.  Fed. R. Evid. 702(a)-(d).

3         As explained by the United States Supreme Court, Rule 702 "assign[s] to the trial judge

4    the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant

5    to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The

6    district court performs a "gatekeeping role," determining whether the proffered evidence is:  (1)

7    reliable, i.e., whether the expert's testimony reflects scientific knowledge, the findings are

8    derived by the scientific method, and the work product amounts to "'good science'"; and (2)

9    relevant, i.e., "that it logically advances a material aspect of the proposing party's case."

10   *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995) ("*Daubert II*")

11   (quoting and citing *Daubert*, 509 U.S. at 590, 593-94, 597).  This gatekeeping obligation extends

12   to all expert testimony, not only testimony based on scientific knowledge.  *Kumho Tire Co., Ltd.*

13   *v. Carmichael*, 526 U.S. 137, 141 (1999).  The basis for expert testimony may therefore rest on

14   personal knowledge or experience.  *Id*. at 150.

15        The district court has broad discretion to assess the relevance and reliability of expert

16   testimony.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997) (district court decisions

17   are reviewed for abuse of discretion); *United States v. Alatorre*, 222 F.3d 1098, 1104-05 (9th Cir.

18   2000) (describing a district court's latitude over both the decision to admit expert testimony and

19   with respect to the procedures by which to assess reliability).  The proponent of expert testimony

20   bears the burden of establishing admissibility by a preponderance of the evidence.  *Daubert*, 509

21   U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)).

22        In asserting Hendricks' expertise, Plaintiffs note his admission as an expert on credit

23   reporting and privacy issues by courts around the country, his recognition as an expert in the

24

1   credit reporting industry by the Federal Trade Commission, Congress, and major credit reporting

2   agencies, and his publications on credit reporting and privacy issues.  *See* Dkt. 35-1.  Plaintiffs

3   argue expert evidence from Hendricks is necessary to help the jury understand the inner

4   workings of the credit reporting industry and to place Plaintiffs' experience within the context of

5   RMI's policies and procedures and in relation to other mixed file cases.

6        RMI seeks to exclude or, alternatively, to limit the proffered expert report and testimony.

7   Specifically, RMI argues Hendricks is not qualified to serve as an expert in this case, that his

8   opinions are legally deficient in failing to identify sufficient facts or data considered, that the

9   opinions in the expert report are inadmissible, and that he should not be allowed to testify

10  regarding damages.

11  A.     Qualifications

12       RMI argues Hendricks lacks adequate qualifications, such as industry experience,

13  training, or relevant education, to serve as an expert in this case.  It depicts his alleged expertise

14  as insufficiently based on the fact others have hired him to serve as an expert and points to cases

15  in which courts have limited his testimony.  *See, e.g.*, *Reilly v. Vivint Solar*, No. C18-12356,

16  2020 WL 3047546, at *4 (D. N.J. June 8, 2020) (precluding Hendricks' testimony as to

17  damages).  RMI argues that, should the Court find Hendricks to have any useful expertise, it

18  should limit his testimony to a generalized description of the credit reporting process.  *See, e.g.,*

19  *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, No. C13-2260, 2016 WL 3653512, at *2 (D. Ariz. Apr. 22,

20  2016) (allowing Hendricks' testimony "regarding the relevant industry standards for

21  characterizing and reporting consumer credit data or describing how Fannie Mae's procedures

22  comport with these standards[,]" but not an "opinion as to whether these procedures should be

23

24

ORDER RE: RMI MOTION TO EXCLUDE OR
LIMIT EXPERT TESTIMONY AND REPORT - 4

1    considered 'unreasonable' under the FCRA, because this is an ultimate issue that will be decided

2    by the jury.") (citations omitted).

3        Numerous courts have found Hendricks qualified to offer expert evidence in cases

4    involving the FCRA and credit reporting.  *See, e.g.*, *Brown v. Vivint Solar, Inc.*, No. C18-2838,

5    ___F. Supp. 3d ___, 2020 WL 1479079, at *2 (M.D. Fla. Mar. 26, 2020) (finding Hendricks

6    "qualified to testify about the FCRA generally and credit reporting issues" and as to "the

7    industry standards for preventing privacy invasions, as well as comparing Defendants' conduct

8    to industry standards"); *Reilly*, 2020 WL 3047546, at *2-3 (finding Hendricks "qualified to

9    provide testimony as to the basics of credit reporting and credit data privacy, and the polices

10   used in the industry relevant thereto[,]" including "the issues of industry standards for data

11   privacy policies as they relate to credit inquiries."); *Cramer v. Equifax Info. Servs.*, No. C18-

12   1078, 2019 WL 4468945, at *3 (E.D. Mo. Sept. 18, 2019) ("As an industry expert, Mr.

13   Hendricks may testify about the relevant industry practices for reporting and investigating

14   consumer credit data, . . . , the relevant practices for reporting accurate credit data, and how Bay

15   Area's actions in connection with plaintiff's credit dispute comport with those industry

16   standards.")  *See also* Dkt. 35-1 at 11-30 (listing cases in which Hendricks has testified at trial or

17   been deposed as an expert).  His knowledge and experience extends to mixed file cases.  *See,*

18   *e.g., Valenzuela v. Equifax Info. Servs. LLC*, No. C13-2259, 2015 WL 6811585, at *2 (D. Ariz.

19   Nov. 6, 2015) (finding Hendricks qualified to offer testimony in a mixed file case); *Miller v.*

20   *Equifax Info. Servs., LLC*, No. C11-1231, 2014 WL 2123560, at *2 (D. Or. May 20, 2014)

21   (noting Hendricks "testified about other mixed-file cases in which juries had found Equifax

22   violated FCRA").

23        As described by more than one court:

24

ORDER RE: RMI MOTION TO EXCLUDE OR
LIMIT EXPERT TESTIMONY AND REPORT - 5

1
2
3
4
5
6

> For thirty-three years, Hendricks researched, wrote, edited, and published a bi-weekly newsletter covering various aspects of the FCRA.  For ten years, he served as a privacy expert consultant for the Social Security Administration, where he reviewed policies and practices regarding use and disclosure of personal data. Hendricks also has a FCRA certification from the National Credit Reporting Association.  Additionally, Hendricks has testified about the FCRA and related matters before the United States House Financial Services Committee and Senate Banking Committee, and has been admitted as an expert witness to testify on similar matters in both state and federal courts.  These experiences qualify Hendricks to offer expert witness testimony [on] certain topics in this case.

7    *Cramer*, 2019 WL 4468945, at *3 (quoted cases and quotation marks omitted).  *See also Reilly*,

8    2020 WL 3047546, at *4 (". . . Hendricks' curriculum vitae reveals he has been actively engaged

9    in the privacy industry, through consulting roles and otherwise, for more than thirty years.  Both

10   the United States Senate and House of Representatives have relied upon his testimony, as have a

11   number of courts throughout the country.  He has consulted for large governmental organizations

12   on privacy policy implementation and review.  Hendricks represents that the methodology

13   behind his opinions flows from this experience; the Court agrees.")  There is, indeed, little

14   question that "Hendricks has done more than simply accumulate experience testifying."

15   *Valenzuela*, 2015 WL 6811585, at *2 n.1.

16       Considering the evidence of his extensive knowledge and some forty years of relevant

17   experience, *see* Dkt. 35-1, this Court likewise finds Hendricks qualified to offer an expert report

18   and testimony in relation to the FCRA and this case.  That is, the Court concludes that

19   Hendricks' specialized knowledge on the FCRA, credit reporting agencies and processes,

20   industry standards, mixed files, and other matters pertinent to this case will help the trier of fact

21   to understand the evidence and to determine facts at issue.  *See, e.g., Zabreskie*, 2016 WL

22   3653512, at *2 ("A layperson is not likely to have independent knowledge of the intricacies of

23   how consumer reports are typically interpreted and Mr. Hendricks's specialized knowledge on

24

1   this topic will assist the trier of fact.")  The Court separately addresses below RMI's challenges

2   to the specific opinions in the expert report.

3   B.          Facts or Data Considered

4          A testifying expert witness must provide a report disclosing "the facts or data considered

5   by the witness in forming" the expert's opinions.  Fed. R. Civ. P. 26(a)(2)(B)(ii); *see also Biestek*

6   *v. Berryhill*, __ U.S. __, 139 S.Ct. 1148, 1154 (2019) ("[A]n expert witness must produce all data

7   she has considered in reaching her conclusions."); Fed. R. Evid. 702(b) (expert's opinion must be

8   "based on sufficient facts or data").  The obligation to disclose "extends to any facts or data

9   'considered' by the expert in forming the opinions to be expressed, not only those relied upon by

10  the expert."  Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note to 2010 Amendment.  Where

11  a party fails to comply with Rule 26 disclosure obligations, "the party is not allowed to use that

12  information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

13  failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

14         RMI argues that Hendricks' expert report is legally deficient under Rule 26(a)(2)(B)(ii)

15  given his failure to identify the "facts or data" he considered in forming his opinions.  Fed. R.

16  Civ. P. 26.  It points to the report as listing only Plaintiffs' Complaint and unidentified

17  "Documents Produced by Plaintiffs and Defendant, as of the date of this report."  Dkt. 35-1 at

18  34.  RMI observes that it has not yet been deposed or furnished Plaintiffs with any documents

19  describing its internal business practices.  *See* Dkt. 35 at 2, n.3 (stating that, while Plaintiffs

20  served discovery requests, they have never followed up on any of RMI's objections) and at 9, n.7

21  ("Plaintiffs have not deposed RMI.  RMI has not furnished plaintiffs with any of its internal

22  control documents that would either address or ignore the issue of mixed files.")  RMI argues

23  that, given the failure to comply with Rule 26(a)(2)(B)(ii), the reliability and quality of the expert

24

1  report cannot be evaluated.  It contends that, on this basis alone, the Court should not permit the

2  expert report to be entered into evidence or to stand as the basis for Hendricks' opinion

3  testimony.

4        The expert report indicates that Hendricks reviewed the Complaint, documents produced

5  by the parties as of the date of the report, and, for foundational purposes, the FCRA and

6  publications on the FCRA and credit reporting.  Dkt. 35-1 at 34.  The report also contains

7  citations to other publications, case law, a consent order, and a document on RMI's website

8  providing a "Summary of Rights" under the FCRA.  Dkt. 35-1 at 32-33; *see also id*. at 37-40.

9        In responding to the motion to exclude, Plaintiffs provide a copy of the consumer reports

10  RMI generated in relation to Plaintiffs, as produced in initial disclosures by Cross Defendant

11  Dale Perozzo.  *See* Dkt. 40-1, ¶3 & Dkt. 40-2.  Plaintiffs also assert that Hendricks, through his

12  role as an expert witness in numerous cases, has reviewed "countless deposition transcripts from

13  employees of credit reporting agencies[]" and "examined thousands of pages of the agencies'

14  internal documents."  Dkt. 40 at 9.

15        Plaintiffs do not directly respond to RMI's argument as to the specific facts or data relied

16  upon by Hendricks.  The Court therefore lacks information as to the documents disclosed by the

17  parties and considered by Hendricks in rendering his opinions.  To the extent his opinions rest on

18  his expertise in relation to the credit reporting industry as a whole, the report is sufficiently

19  supported under both Rule 26 and Rule 702.  However, outside of Hendricks' review of the

20  consumer reports at the center of this litigation and RMI's "Summary of Rights", the basis for

21  his knowledge as to RMI's practices or procedures is unknown.  *Cf. Valenzuela*, 2015 WL

22  6811585, at *3 (finding Hendricks "qualified to discuss Equifax's 'inner workings' because of

23  his experience with credit reporting agencies, including his expert witness experience in previous

24

1  Equifax cases[]" and that Equifax could explore any inaccuracies in his testimony on cross-

2  examination).  The Court, as such, agrees with RMI that Hendricks may not offer expert opinions

3  as to RMI's practices and procedures unless he identifies sufficient facts or data to support those

4  opinions.

5       The Court is not, however, persuaded that the proper remedy for this deficiency is to

6  exclude all evidence based on and derived from the expert report.  Instead, the still early

7  procedural posture of this case warrants providing Plaintiffs the opportunity to submit a revised

8  expert report, supplemented with any evidence obtained through discovery and otherwise

9  compliant with Rule 26(a)(2)(B)(ii) and Rule 702.[3]

10  C.    Hendricks' Opinions

11       In the "Opinion-Summary" section of the expert report, Hendricks sets forth seven

12  opinions.  *See* Dkt. 35-1 at 31-32.  RMI argues all seven opinions are flawed.

13       In the first opinion, Hendricks describes a mixed file as a well-known and long-standing

14  cause of consumer report inaccuracy, defines a mixed file as a "'Consumer Report in which

15  some or all of the information pertains to a person or persons other than the person who is the

16  subject of the Consumer Report[,]'" and states that a "well-known and long-standing cause of

17  mixed files is similarity of key identifiers such as name." *Id*. at 31.  RMI questions the basis for

18  Hendricks' opinion that RMI's consumer reports on Plaintiffs were "mixed files", noting the

19  record does not demonstrate Hendricks ever reviewed the reports.  It is, however, undisputed the

20  consumer reports generated by RMI identified criminal violations, specifically convictions for

21  sexual offenses, attributable to other individuals with the same first and last names as Plaintiffs.

22

23     [3] The parties have until July 19, 2022 to complete discovery, Dkt. 22, and the Court recently granted RMI's motion to extend the deadline for the submission of its rebuttal expert witness report until after the Court considers
24  its motion to exclude, Dkt. 39

1 | *See* Dkt. 26 (RMI's Amended Cross Complaint), ¶¶2.7-2.9, 3.2.  Moreover, in making

2 | determinations of fact, the jury will consider the consumer reports.  Dkt. 40-1, ¶3 & 40-2.

3 | Hendricks' knowledge regarding mixed files, as set forth in the first opinion, will aid the jury in

4 | understanding this case.  *Valenzuela*, 2015 WL 6811585, at *2 (concluding Hendricks could

5 | testify "about the indicia of a mixed file, typical and best practices for identifying and correcting

6 | a mixed file, and the FCRA's standards for correcting a mixed file[,]" that this information was

7 | neither common sense, nor within a layperson's independent knowledge, and that Hendricks'

8 | specialized knowledge would assist the trier of fact).

9 | In the second opinion, Hendricks opines it is "incumbent upon consumer reporting

10 | agencies ('CRAs') to have procedures in place to guard against and/or prevent mixed files."

11 | Dkt. 31-1 at 31.  RMI argues Hendricks is not qualified to offer this opinion because he lacks

12 | industry experience, training, or relevant education.  The Court disagrees and finds Hendricks

13 | qualified to offer expert testimony on this issue.  Moreover, as with the first opinion, Hendricks'

14 | opinion as to industry standards relating to mixed files will assist the trier of fact.

15 | Hendricks states as follows in his third, fourth, and fifth opinions:  (1) that Plaintiffs

16 | "became victims" of mixed files because RMI lacked adequate procedures to prevent mixed

17 | files; (2) that RMI "caused profound inaccuracies because it was willing to mix other people's

18 | criminal history information into Plaintiffs' consumer reports based on exceedingly permissive

19 | and loose data-matching criteria", by relying on no more than a partial name-match or possibly a

20 | match by date or year of birth, "even though Plaintiffs' last name, 'Smith,' was one of the most

21 | common names in the United States."; and (3) that RMI's conduct in this case reflected its

22 | disregard of both "decades of notice to the consumer reporting industry that exceedingly

23 | permissive and loose data-matching criteria causes mixed files and inaccuracy[,]" and "the need

24 |

1   to base its data-matching on a sufficient number of identifiers including Social Security Numbers

2   ('SSNs') and actual dates-of-birth ('DoBs'), particularly when the data subject has a common

3   name, like Smith."  Dkt. 35-1 at 31.  RMI deems each of these opinions speculative and

4   unreliable because Plaintiffs did not obtain and Hendricks did not have any evidence of RMI's

5   internal procedures or practices, including any information about its internal data management

6   procedures to guard against inaccuracy.  RMI also argues that Hendricks ignores the fact

7   "virtually no" public records include SSNs.  Dkt. 35-2, ¶5.

8           Again, Hendricks may offer expert evidence in relation to mixed files based on his

9   knowledge of and experience with industry standards.  As addressed above, Hendricks may not

10  offer expert opinions as to RMI's practices and procedures unless he identifies sufficient facts or

11  data to support those opinions.  Thus, to the extent he explains the specific bases for his

12  knowledge, how he applied his knowledge and experience to the facts at hand, and how that

13  application yields his opinions, he may testify as to RMI's practices and procedures, its acts or

14  omissions in this case, and a comparison to industry standards.  *See, e.g.*, *Malverty v. Equifax*

15  *Info. Servs., LLC*, No. C17-1617, 2019 WL 5549146, at *2-3 (M.D. Fla. Oct. 28, 2019) (allowing

16  Hendricks' testimony "about what additional measures Equifax could have taken to ensure the

17  accuracy of [the] consumer report," including "whether Equifax's 'procedures match industry

18  standards if he dissects the basis for his knowledge of industry standards, explains how he

19  applied his experience to the facts and how such application yields his opinion.'") (citations

20  omitted); *Zabriskie*, 2016 WL 3653512, at *2 (allowing Hendricks' testimony "regarding the

21  relevant industry standards for characterizing and reporting consumer credit data or describing

22  how Fannie Mae's procedures comport with these standards."); *Williams v. First Advantage LNS*

23  *Screening Sols. Inc.*, No. C13-0222, 2015 WL 9690018, at *4 (N.D. Fla. Mar. 31, 2015) ("Mr.

24

1   Hendricks conveyed prevailing industry norms that do utilize additional identifiers based on his

2   extensive experience with the industry. This type of information is useful to the jury because it

3   allows them to infer from such widespread practice that industry players believe increasing the

4   number of individual identifiers strengthens the accuracy of the consumer reports. It provides . . .

5   a benchmark by which the jury can assess whether Defendant's methods are reasonable.")

6   Hendricks may, for example, opine as to the ways in which the specific consumer reports at issue

7   in this case do or do not comport with industry standards.  RMI may challenge that testimony

8   through cross examination.

9        Hendricks may not, on the other hand, offer mere speculation.  *Reilly*, 2020 WL

10   3047546, at *6; *Brown*, 2020 WL 1479079, at *4.  Nor may he offer conclusions drawn from his

11   own interpretation of the facts, such as that Plaintiffs "became victims" or the "profound" nature

12   of inaccuracies.  Such conclusions are properly left to the jury and based on their consideration

13   of the facts established at trial.  *See, e.g., Brown*, 2020 WL 1479079, at *4 (finding Hendricks'

14   opinions that unauthorized access to credit information causes profound harm, that continued

15   complaints showed the defendants' lack of concern, and that their sales quotas incentivized

16   access to reports without consent were conclusions "the jury may or may not come to, but they

17   do not need Hendricks' opinions on these matters."); *accord Reilly*, 2020 WL 3047546, at *5

18   (same).  Likewise, because it falls within the province of the jury, Hendricks may not opine as to

19   RMI's motivations, intentions, or state of mind, such as its alleged "disregard" of notice relating

20   to mixed files.  *See, e.g., Santos v. Experian Info. Sols., Inc.*, No. C19-23084, 2021 WL 6144643,

21   *4 (S.D. Fla. Nov. 30, 2021) (excluding Hendricks' testimony that defendant "knowingly

22   'disregarded'" procedures because it improperly opined on knowledge and motive, the

23   documents Hendricks' referred to spoke for themselves, and because:  "Speculating what

24

1   Experian knew from them would be unhelpful to a jury, beyond testifying to what those facts

2   would mean to him given his past experience. But to take the next step and expressly opine what

3   Experian's state of mind or intent was goes beyond the scope of permissible expert testimony

4   under Rule 702."); *Reilly*, 2020 WL 3047546, at *5 (finding Hendricks' opinions as to a

5   purported "'lack of concern'" for consumer privacy or the creation of incentives to violate

6   consumer privacy laws to touch upon motivation or specific intent and to be decisions properly

7   left to the jury).

8           Hendricks next, in his sixth opinion, opines it is "standard throughout the consumer

9   reporting industry for [CRAs] such as Defendant to provide consumers with copies of their

10  reports ('full file disclosures') when requested."  Dkt. 35-1 at 31.  RMI argues this opinion is not

11  based on the facts and is contradicted by other evidence.  *See* Dkt. 35-2, ¶7 (explaining RMI's

12  procedures for furnishing consumers with copies of reports), Dkt. 35-1 at 37-40 (summary of

13  consumer's rights provided on RMI's website), and *id.* at 41-49 (forms to request copies of

14  consumer reports).  These argument are not persuasive.  Again, Hendricks is qualified to offer

15  expert evidence as to these and other standard industry practices, and RMI is free to cross-

16  examine Hendricks and to challenge the weight afforded his opinion through the introduction of

17  contradictory evidence.  *See, e.g., Lister v. Hyatt Corp.*, No. C18-0961-JLR, 2019 WL 6701407,

18  at *11 (W.D. Wash. Dec. 9, 2019) (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010),

19  as amended (Apr. 27, 2010) ("Shaky but admissible evidence is to be attacked by cross

20  examination, contrary evidence, and attention to the burden of proof, not exclusion.") (citing

21  *Daubert*, 509 U.S. at 596)).

22          RMI did not address a follow-up sentence in the sixth opinion:  "But Defendant lacked an

23  adequate mechanism or procedure to ensure that Plaintiffs were provided copies of their full file

24

1    disclosures when they requested them.  This reflected Defendant's disregard of long-standing,

2    well-known industry standards under which CRAs routinely provide consumers with their full

3    file disclosures upon request."  Dkt. 35-1 at 31-32.  However, the same reasoning expressed

4    above applies to this opinion.  That is, Hendricks may offer testimony as to RMI's practices or

5    procedures only to the extent he can identify a basis for his knowledge; he may not speculate;

6    and he may not delve into RMI's state of mind.

7         Finally, in his seventh opinion, Hendricks opines "[t]he inaccurate consumer report

8    information, portraying Plaintiffs as criminals, was not only a substantial factor in their

9    application for an apartment being rejected, it was the preeminent factor."  Dkt. 35-1 at 32.  RMI

10   depicts this as both an improper opinion on causation, which is an issue of law in this case and

11   the province of the jury, and as sheer speculation, without any evidence in support.

12        "[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on

13   an ultimate issue of law."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016

14   (9th Cir. 2004) (citation omitted; emphasis retained).  However, "[e]xpert opinions are not

15   objectionable merely because they embrace an ultimate issue."  *Lister*, 2019 WL 6701407, at *12

16   (citing Fed. R. Evid 704(a)).  *See, e.g.*, *Hangarter*, 373 F.3d at 1016 (expert's opinion that

17   defendants failed to comport with industry standards for claims adjustment in the context of an

18   insurance bad faith claim did not constitute a legal conclusion of bad faith:  "While [the expert's]

19   testimony that Defendants deviated from industry standards supported a finding that they acted

20   in bad faith, [the expert] never testified that he had reached a legal conclusion that Defendants

21   actually acted in bad faith (i.e., an ultimate issue of law).");  *Lister*, 2019 WL 6701407, at *12

22   (expert could not opine as to fault, which was the ultimate issue of law in the case, but could

23

24

1    testify to the foreseeability of behavior because "foreseeability is generally an issue of fact.")

2    (citations omitted).

3        Plaintiffs allege, in relevant part, that RMI violated the FCRA "by failing to establish or

4    to follow reasonable procedures to assure maximum possible accuracy in the preparation of the

5    credit reports and credit files RMI published and maintain concerning Plaintiffs." Dkt. 1, ¶5.2.

6    They allege that, as a result, they suffered damages, "including economic loss, damage to

7    reputation, emotional distress and interference with Plaintiffs' normal and usual activities for

8    which Plaintiffs seek damages in an amount to be determined by the jury." *Id.*, ¶5.3.

9        It is not clear Hendricks' opinion – that inaccurate information in the consumer reports

10   was a substantial and the preeminent factor in the decision to reject Plaintiffs' rental application

11   – reaches a legal conclusion.  However, it is also true that expert testimony on this point is not

12   necessary to assist the jury.  In fact, documents RMI submitted with its motion provide direct

13   support for this statement.  Specifically, "Washington Tenant Adverse Action Letter[s]"

14   addressed to Plaintiffs advise that their applications for residency have been rejected based on

15   "Information received in a criminal record" and that that information was obtained from Straight

16   Arrow Screening, RMI's subsidiary.  Dkt. 35-1 at 2, 41-42 & 45-46.  Accordingly, while

17   Hendricks may provide helpful testimony as to typical consequences of mixed files, as discussed

18   further below, he may not stray into opinion testimony as to any factor in the decision to reject

19   Plaintiffs' rental application because the jury will have sufficient evidence upon which to make

20   that factual determination.

21   D.    Damages

22       RMI argues that, as found by numerous courts, Hendricks should not be allowed to testify

23   about damages.  *See, e.g., Reilly*, 2020 WL 3047546, at *4 ("Hendricks will not be permitted to

24

1   testify about Plaintiff's damages, damages that he believes commonly present in privacy

2   invasion victims, or the information gathered during his interviewing of other privacy breach

3   victims."); *Brown*, 2020 WL 1479079, at \*3 ("Hendricks is not qualified to opine regarding

4   Plaintiffs' emotional or physical damages or the emotional and physical damages that generally

5   arise from FCRA violations.")  *See also* Dkt. 42 at 3-4.[4]  Plaintiffs contend Hendricks can offer

6   helpful testimony as to the types of damages common to victims of credit reporting errors, the

7   foreseeability of such harms to RMI, and that RMI is on notice of such harms.  *See Sandigo v.*

8   *Ocwen Loan Servicing, LLC*, No. C17-2727, 2019 WL 2579341, at \*5 (N.D. Cal. June 24, 2019)

9   (allowing Hendricks' testimony as to the impact of the defendant's actions on the plaintiff's

10  credit score and creditworthness and stating any deficiencies in his testimony could be addressed

11  through cross examination).  Plaintiffs also contend Hendricks is qualified to testify about typical

12  consequences of false credit reports.  *See FTC v. Accusearch, Inc.*, No. C06-0105 (D. Wy. Feb.

13  5, 2007) (order denying motion to strike (Dkt. 95) at 4-5) (finding Hendricks qualified to testify

14  "as to the harms caused or likely to be caused by the selling of a consumer's personal phone

15  records, any countervailing benefits, and the appropriate steps to avoid or mitigate potential

16  harm.")

17       As argued by Plaintiffs, Hendricks may offer expert testimony as to typical consequences

18  resulting from issues with consumer reports.  *See, e.g.*, *Brown*, 2020 WL 1479079, at \*3 n.2

19  ("Hendricks is permitted to testify regarding the damage to a person's credit report that may be

20  caused by a hard inquiry, as well as the risk of identity theft that can result from unauthorized

21

22

---

23  [4] In their sur-reply, Plaintiffs deem impertinent RMI's citation to cases excluding Hendricks' testimony as to emotional distress damages because the expert report from Hendricks does not opine on that topic.  Dkt. 46 at 2-3.  Because the parties appear to more generally dispute the issue of damages-related expert testimony, the Court disagrees with Plaintiffs' contention.

24

1    access."); *Neal v. Ford Motor Credit Co., LLC*, No. C15-3474, 2016 WL 7971447, at *2 (W.D.

2    Mo. Oct. 18, 2016) (excluding Hendricks' testimony as to specific damages alleged, but allowing

3    his testimony as to defendant's actions and their effect on plaintiff's credit report, credit score, or

4    ability to obtain credit); *Williams*, 2015 WL 9690018, at *4 (excluding Hendricks' testimony as

5    to specific damages alleged, but allowing his testimony as to the "ordinary, industry-standard

6    consequences that flow from inaccurate consumer reporting to the extent he possesses such

7    knowledge.").  His expertise extends to mixed files and, as such, any typical consequences

8    associated with mixed files.

9         However, like the vast majority of courts to consider the issue, the Court finds no basis

10    for concluding Hendricks is qualified to offer opinions as to the specific damages alleged in this

11    case, including Plaintiffs' economic loss, damage to their reputations, emotional distress, and

12    interference with their normal and usual activities.  *See, e.g.*, *Malverty*, 2019 WL 5549146, at *2

13    (observing that most courts have not allowed Hendricks to testify as to damages, finding he

14    could not opine as to whether Equifax caused Plaintiff emotional distress, and stating "any

15    opinion about the types of damages that are common to plaintiffs in comparable circumstances

16    would not assist the jury, as it will be instructed on the proper measure of damages.")  Plaintiffs

17    may themselves offer testimony as to damages and a determination as to the amount of damages

18    owed, if any, would be made by a jury.  *See, e.g., Valenzuela*, 2015 WL 6811585, at *3 (finding

19    Hendricks could not opine as to damages because he "is not qualified to address physical,

20    emotional, or economic effects of an inaccurate credit report, or to estimate the value of

21    'expended time and energy to correct errors...in addition to loss of time and energy, loss of

22    opportunity[,]'" and that his testimony would not assist the fact-finder because the plaintiff could

23    testify on all of those subjects).  *See also Anderson v. Equifax Info. Servs., LLC*, No. C16-2038,

24

ORDER RE: RMI MOTION TO EXCLUDE OR
LIMIT EXPERT TESTIMONY AND REPORT - 17

1 | 2018 WL 1542322, at *5 (D. Kan. Mar. 29, 2018) (finding the foreseeability of damages a

2 | factual issue within the understanding of a lay juror and that the plaintiff failed to show how

3 | Hendricks' opinions would be helpful to the damages determination).

4 | CONCLUSION

5 | RMI's Motion to Exclude, or Limit, Proffered Testimony and Report of Evan D.

6 | Hendricks, Dkt. 35, is GRANTED in part and DENIED in part.  Hendricks may offer expert

7 | evidence in this case consistent with the rulings set forth above.  To the extent Plaintiffs intend to

8 | offer an amended expert report consistent with the Court's ruling, it may do so within **fourteen**

9 | **(14) days** of the date of this Order.  Defendants may, within **twenty-eight (28) days** of the date

10 | of this Order, submit a rebuttal expert report.

11 | Dated this 22nd day of June, 2022.

12

13 | S. KATE VAUGHAN
United States Magistrate Judge

14

ORDER RE: RMI MOTION TO EXCLUDE OR
LIMIT EXPERT TESTIMONY AND REPORT - 18